UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: ) | |
| ) | Case No. 15-23985-EEB |
| DON RICHARD ILEY, ) | Chapter 7 |
| ) | |
| Debtor. ) | |
| ) | |
| In re: ) | Case No. 15-23986-EEB |
| ) | Chapter 7 |
| ILEY & ASSOCIATES, INC., ) | |
| ) | Jointly Administered Under |
| Debtor. ) | Case No. 15-23985-EEB |
| TOM H. CONNOLLY, ) | |
| Chapter 7 Trustee, ) | |
| ) | Adversary Proceeding No. 16- |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| MARY ILEY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**COMPLAINT**

Tom H. Connolly, as chapter 7 trustee, files this Complaint and seeks an order, pursuant to 11 U.S.C. § 548(a)(1)(A), 11 U.S.C. § 544, and Colo. Rev. Stat. § 38-8-105(1)(a), avoiding transfers to Mary Iley, as follows:

**INTRODUCTION**

Prior to the commencement of these cases, Don Richard Iley owned and controlled Iley & Associates, Inc. Among other services, Iley & Associates offered a payroll processing service. Iley represented to his payroll processing customers that money would be withdrawn from their accounts to pay the wages and taxes of the customer's employees. Instead of paying the federal taxes, Iley used the money for other purposes, including paying $900,000 more than required on his home mortgage in 2014 and 2015. Iley concealed his actions by providing to his customers false tax returns that showed he paid the IRS on the customer's behalf, while Iley generated and provided to the Internal Revenue Service false reports claiming no taxes were owed.

Mary Iley is Don Iley's spouse. Since 1998, Don Iley has been Mary Iley's only material source of money. Mary Iley is a joint owner of the property Don Iley purchased in 2009 (the "4th

1

Street Property"), though she contributed no money towards the purchase. From 2010 through 2012, Don Iley constructed a house on the 4th Street Property. Iley paid for the construction in part with a bank construction loan, and in part with money from Iley & Associates' bank accounts.

In 2012 and 2013, at the same time he was defrauding his clients, Don Iley purchased two vehicles and had them jointly titled with Mary Iley. Mary Iley contributed no money towards the purchase or maintenance of the vehicles. In 2014 and 2015, at the same time he was defrauding his payroll customers, Don Iley paid $900,000 more on the mortgage secured by the 4th Street Property than was required.

On November 29, 2015, shortly before these cases were commenced, Don Iley wrote a check to Mary Iley for $200,000. The money was drawn on a line credit from UMB Bank, which is secured by the 4th Street Property. The $200,000 check was deposited in an account in the name of Mary Iley only.

The payments to the mortgage company were for the benefit of Mary Iley. Each payment to the mortgage company increased Mary Iley's apparent equity in the 4th Street Property by ½ the amount of each payment. Connolly seeks to avoid and recover as a fraudulent transfer to Mary Iley, the transfer of apparent equity to Mary Iley resulting from the payments to the mortgage company. Connolly also seeks to avoid and recover the transfer of ½ record ownership of the two vehicles to Mary Iley. Finally, as to Mary Iley, Connolly seeks to avoid the obligation to repay the $200,000 line of credit to UMB in that the obligation was incurred solely for the benefit of Mary Iley.

## JURISDICTION AND VENUE

1. The underlying bankruptcy case was commenced on December 28, 2015, when creditors filed an involuntary chapter 7 against Don Richard Iley. Prior to ruling on the involuntary petition, Don Iley moved to convert to chapter 11 [Docket No. 10]. On January 26, 2016, the Court entered an Order converting the case to chapter 11 [Docket No. 20] along with an Order for Relief [Docket No. 35].

2. On May 11, 2016, the Court entered an Order converting the case to a chapter 7 [Docket No. 260] and Connolly was appointed trustee.

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157.

4. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (H), and (O).

5. Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

6. Pursuant to General Procedure Order No. 2016-01, Connolly consents to entry of final judgment by this Court.

## GENERAL ALLEGATIONS

The 4th Street Property

7. In 2009, Don Iley purchased the 4th Street Property as two contiguous lots containing approximately 4.0 acres of land for $627,680. Iley caused the 4th Street Property to be titled jointly to Don Iley and Mary Iley. Attached as **Exhibit A** are accurate copies of the warranty deed for the 4th Street Property.

8. In May 2010, Don Iley vacated the lot line between the two contiguous lots that comprise the 4th Street Property. A copy of the recorded lot line vacation is attached as **Exhibit B**.

9. From 2010 through 2012, Iley constructed a three story, 10,000 square foot house with five bedrooms, five full bathrooms, and three half baths on the 4th Street Property. The house is of the highest quality construction and finish. The 4th Street Property also contains a barn, three 2-car garages, a shed, a hot tub and substantial landscaping, including a gazebo.

The Iley & Associates Scheme

10. Beginning at least in 2010, Don Iley failed to pay to the federal taxes on behalf of his payroll customers. Bank records for Iley & Associates' U.S. Bank account ending 4136 show that in 2012, Iley & Associates was paid approximately $1,600,000 by payroll customers for payment of state and federal taxes. During that time, Iley & Associates failed to pay the federal payroll taxes on behalf of his clients.

11. In August 2015, when Iley & Associates was at its peak, Iley & Associates had approximately 140 payroll customers and collected approximately $500,000 per month that should have been used to pay the payroll customers' federal taxes. From 2010 through 2015 only a small portion of the money collected was used to pay the federal taxes of the payroll customers. Instead, Iley used the money for personal purposes and for general Iley & Associates purposes, including the following:

   a. Beginning on April 15, 2015 and continuing until November 6, 2015, Iley wrote checks on Iley & Associates' U.S. Bank account ending 4136 payable to cash in the total amount of at least $1,751,326.44.

   b. On March 25, 2015, Iley & Associates transferred $300,000 from the Iley & Associates' U.S. Bank account ending 4136 to Iley's personal U.S. Bank account ending 4591. On March 31, 2015, Iley transferred $300,000 to Kinecta from his personal U.S. Bank account ending 4591.

   c. Beginning in January 2015, Iley & Associates made monthly payments of over $7,325 from Iley & Associates' U.S. Bank account ending 4136 to Kinecta.

    d. On November 12, 2014, Iley & Associates transferred $375,000 from the Iley & Associates' U.S. Bank account ending 4136 to Iley's personal U.S. Bank account ending 4591. On November 18, 2014, Iley transferred $300,000 to Kinecta, from his personal U.S. Bank account ending 4591.

    e. On April 16, 2014, Iley & Associates transferred $250,000 from the Iley & Associates' U.S. Bank account ending 4136 to Iley's personal U.S. Bank account ending 4591. On April 22, 2014, Iley transferred $300,000 to Kinecta, , from his personal U.S. Bank account ending 4591.

    f. On April 3, 2014, Iley & Associates transferred $50,000 from the Iley & Associates' U.S. Bank account ending 4136 to Iley's personal U.S. Bank account ending 4591.

    g. On February 8, 2013, Iley & Associates transferred $300,000 from the Iley & Associates' U.S. Bank account ending 4206 to Hawaiian Jelly's U.S. Bank account ending 6101.

    h. On March 26, 2013, Iley & Associates transferred $200,000 from the Iley & Associates' U.S. Bank account ending 4206 to Hawaiian Jelly's U.S. Bank account ending 6101.

    i. Each month, Iley & Associates paid thousands of dollars towards credit card debt on accounts held in the name of Mary Iley.

<u>Transfers to and for the Benefit of Mary Iley</u>

  12. Beginning in 2010, Don Iley partially financed the construction of the 4th Street Property with funds from Iley & Associates' bank account. This construction was financed partially with a loan and partially with funds from Iley & Associates' bank accounts.

  13. In July 2010, Iley obtained a $1,350,000 construction loan from Heartland Bank, which was secured by the 4th Street Property. The loan from Heartland Bank was paid off through a series of refinancing loans.

  14. On December 4, 2012, David O. Steckelberg, a friend of Iley's, sent a letter to Kinecta Federal Credit Union indicating that "[t]he operations of the firm Iley & Associates, CPA's will not be jeopardized by the use of business funds for refinancing of Don Iley's personal residence in Parker, CO." An accurate copy of the letter is attached as **Exhibit C**.

15. In January 2013, Iley obtained a loan from Kinecta Credit Union in the amount of $1,250,000. The loan from Kinecta is secured by the 4th Street Property and the proceeds were used to pay off the prior loan secured by the 4th Street Property. A copy of the deed of trust for the benefit of Kinecta is attached as **Exhibit D**.

16. The monthly payment on the Kinecta loan, including an escrow for insurance and real estate taxes was approximately $7,300. From January 2015 through November, 2015, the monthly payment of $7,325 for the benefit of Kinecta was paid from the Iley & Associates 4136 account at US Bank.

17. The payments to Kinecta on March 25, 2015, November 12, 2014, and April 3, 2014 totaled $900,000.00 (the "Equity Transfer") and were made in addition to the required monthly payments. The money for the payments came from the Iley & Associates' 4136 account at U.S. Bank.

18. On November 29, 2015, Don Iley wrote a $200,000 check to Mary Iley. A copy of the check is attached as **Exhibit E**. The $200,000 check was written on an UltraEquity Line of Credit at UMB Bank (the "UMB Obligation"). The line of credit is secured by the 4th Street Property. On November 30, 2015, Mary Iley deposited the check into an account in her name only at Westerra Credit Union.

19. On August 27, 2013, Don Iley purchased a 2005 Chevy Avalanche, VIN No. 3GNEK12Z95G226338 (the "Avalanche"). **Exhibit F** (title). The Avalanche is jointly titled to Mary Iley and Don Iley.

20. On March 30, 2013, Don Iley purchased a 2013 Infiniti, VIN No. JN1BY1ARODM602371 (the "Infiniti" and together with the Avalanche, the "Vehicles"). **Exhibit G** (title). The Infiniti is jointly titled to Mary Iley and Don Iley.

Don Iley and Mary Iley's Finances

21. Don Iley has had sole responsibility for paying household bills since his marriage to Mary Iley in 1989. **Exhibit H**, at 14:15-25, 18:6-19:5, 20:18-19 (M. Iley depo).

22. Mary Iley has not been employed since December of 1997. **Exhibit H**, at 9:3-6 (M. Iley depo).

23. Mary Iley allegedly received a $50,000.00 inheritance in 2001. **Exhibit H**, at 9:16-24 (M. Iley depo).

24. Mary Iley owns one share of Disney stock that results in a dividend of approximately $1.50 every two years. **Exhibit H**, at 10:4-21 (M. Iley depo).

25. Other than her inheritance and dividends from one share of stock, Don Iley has been Mary Iley's sole source of money since 1997. **Exhibit H**, at 9:5-11:4 (M. Iley depo).

5

26. Don Iley and Mary Iley are both borrowers on the note secured by Kinecta Federal Credit Union's deed of trust on the 4th Street Property.

27. The 4th Street Property is subject to a mortgage held by UMB Bank, N.A. in the maximum principal amount of $200,000.00. **Exhibit I** (UMB deed of trust). Don Iley and Mary Iley are both borrowers on the note secured by UMB Bank's deed of trust on the 4th Street Property. **Exhibit J** (UMB note).

28. Don Iley uses the Infiniti as his personal vehicle. **Exhibit H** at 13:4-6 (M. Iley deposition transcript).

29. Mary Iley qualified for a credit card with JP Morgan Chase based on representations that she earned $120,000.00 per month from Iley & Associates. **Exhibit K** (Chase application). Don Iley pays Mary Iley's credit card bill with funds from his Chase bank account ending 8989. **Exhibit L** (Chase CC Payment Sheet).

## FIRST CLAIM FOR RELIEF
### (Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550)
### The Equity Transfer

30. Connolly incorporates his previous allegations.

31. The Equity Transfer increased the value of Mary Iley's interest in the 4th Street Property by $450,000 and constitutes a transfer within the meaning of 11 U.S.C. § 101(54).

32. The Equity Transfer was a transfer of an interest in property of Don Iley.

33. The Equity Transfer was made within two years prior to the petition date.

34. The Equity Transfer was made with actual intent to hinder, delay or defraud creditors.

35. Actual fraudulent intent is shown by, among other things, the following:

    a. The Equity Transfer was a transfer to Mary Iley, an insider of Don Iley;

    b. Don Iley maintained possession or control of the 4th Street Property after the Equity Transfer;

    c. The Equity Transfer was not disclosed in Don Iley's statement of financial affairs;

    d. The Equity Transfer was made for the purpose of keeping the fuits of Iley's scheme out of the reach of creditors;

  e. Don Iley was sued or had been threatened to be sued by former clients of Iley & Associates before the Equity Transfer was made;

  f. Mary Iley gave no value for the Equity Transfer; and

  g. Don Iley was insolvent at the time of the Equity Transfer.

36. The Equity Transfer is avoidable under 11 U.S.C. § 548(a)(1)(A).

37. Connolly may recover the Equity Transfer from Mary Iley under 11 U.S.C. § 550. The result of avoiding and recovering the Equity Transfer from Mary Iley is that after paying Kinecta and UMB, Mary Iley's economic interest in the 4th Street Property is reduced by $450,000.

**SECOND CLAIM FOR RELIEF**
**(Fraudulent Transfer Pursuant to 11 U.S.C. § 548(a)(1)(A))**
**The UMB Obligation**

38. Connolly incorporates his previous allegations.

39. The UMB Obligation decreased the value of Don Iley's interest in the 4th Street Property by $100,000 and constitutes an obligation of Don Iley.

40. The UMB Obligation was incurred within two years of the Petition Date.

41. The UMB Obligation was made with actual intent to hinder, delay or defraud creditors.

42. Actual fraudulent intent is shown by, among other things, the following:

  a. The UMB Obligation was solely for the benefit of Mary Iley, an insider of Don Iley in that Don Iley paid all $200,000 to Mary Iley who deposited all $200,000 into an account solely in her name;

  b. The UMB Obligation was incurred for the purpose of concealing funds from and keeping the $200,000 in equity in the 4th Street Property out of the reach of creditors;

  c. Don Iley had been sued or had been threatened with lawsuits by former clients of Iley & Associates before the UMB Obligation was incurred;

  d. Mary Iley gave no value to Don Iley for the UMB Obligation; and

  e. Don Iley was insolvent at the time he incurred the UMB Obligation.

43. The UMB Obligation is avoidable under 11 U.S.C. § 548(a)(1)(A).

44. Connolly may recover the UMB Obligation from Mary Iley under 11 U.S.C. § 550. The result of avoiding and recovering the UMB Obligation from Mary Iley is that the full amount due to UMB is paid from Mary Iley's interest in the 4th Street Property is reduced by $100,000.

### THIRD CLAIM FOR RELIEF
**(Fraudulent Transfer Pursuant to 11 U.S.C. § 544 and Colo. Rev. Stat. § 38-8-105(1)(a))**
**The Vehicles**

45. Connolly incorporates his previous allegations.

46. Transfers within the meaning of Colo. Rev. Stat. § 38-8-102(13) occurred when Don Iley caused the titles to the Vehicles to be jointly owned by Don Iley and Mary Iley (the "Vehicle Transfers").

47. At the time of the Vehicle Transfers, there were unsecured creditors of Don Iley who have remained as creditors and who have allowable unsecured claims against the bankruptcy estate of Don Iley.

48. The Vehicle Transfers were transfers of an interest in the property of Don Iley.

49. The Vehicle Transfers were made within four years prior to the petition date.

50. The Vehicle Transfers were made with actual intent to hinder, delay, or defraud Don Iley's creditors.

51. Actual intent is shown by, among other things, the following:

   a. The Vehicle Transfers were made to Mary Iley, an insider of Don Iley;

   b. Don Iley maintained possession or control of the Vehicles after the Vehicle Transfers;

   c. Don Iley was insolvent at the time of the Vehicle Transfers; and

   d. Mary Iley gave no value for the Vehicle Transfers.

**WHEREFORE**, Connolly respectfully requests that this Court enter an Order:

   a. pursuant to 11 U.S.C. § 548(a)(1)(A), avoiding and recovering the Equity Transfer from Mary Iley;

   b. pursuant to 11 U.S.C. § 548(a)(1)(A), avoiding and recovering the UMB Obligation from Mary Iley;

        c.      pursuant to 11 U.S.C. § 544 and Colo. Rev. Stat. § 38-8-105(1)(a), avoiding and recovering the Vehicle Transfers from Mary; and

        d.      granting any additional relief the Court deems just and proper.

Dated: October 11, 2016                Respectfully submitted,

                                          **ONSAGER | GUYERSON | FLETCHER | JOHNSON**

                                          s/ Andrew D. Johnson
                                            Andrew D. Johnson, #36879
                                            J. Brian Fletcher, #28629
                                            Gabrielle G. Palmer, #48948
                                          1801 Broadway, Suite 900
                                          Denver, Colorado 80202
                                          Ph: (720) 457-7061
                                          ajohnson@OGFJ-law.com
                                          jbfletcher@OGFJ-law.com

                                          *Counsel for Tom H. Connolly as Chapter 7 Trustee*