# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | ) |
| | ) Case No. 15-23985-EEB |
| DON RICHARD ILEY, | ) Chapter 7 |
| | ) |
| Debtor. | ) |
| | ) |
| In re: | ) Case No. 15-23986-EEB |
| | ) Chapter 7 |
| ILEY & ASSOCIATES, INC., | ) |
| | ) Jointly Administered Under |
| Debtor. | ) Case No. 15-23985-EEB |
| TOM H. CONNOLLY, | ) |
| Chapter 7 Trustee, | ) |
| | ) Adversary Proceeding No. 17- |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JACKSON NATIONAL LIFE INSURANCE | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Tom H. Connolly, as chapter 7 trustee ("Trustee"), files this Complaint and states as follows:

### INTRODUCTION

Don Iley operated a fraudulent payroll scheme through Iley & Associates, Inc. Iley & Associates processed payroll for more than 140 clients and withdrew money from the clients' bank accounts to pay the employees' wages and was supposed to pay the federal, state, and local payroll taxes to the appropriate taxing authority. However, Iley failed to pay the federal payroll taxes on behalf of his clients from 2011 through 2015. Iley concealed his scheme by creating and filing false payroll tax returns for his clients.

Instead of paying his clients' payroll taxes as he promised, Iley used the money for personal and business purposes, including (1) to pay $260,000 for the design, construction, landscaping, and furnishing of his residence, (2) to pay $900,000 in accelerated principal payments on Iley's mortgage; (3) to make more than $1,000,000 in payments in business ventures and retirement accounts; (4) to pay hundreds of thousands of dollars in various business

expenses for Iley & Associates; and (5) to pay for numerous personal expenses, including his children's college tuition.

On April 18, 2017, Iley pleaded guilty to wire fraud under 18 U.S.C. § 1343 and aiding in the preparation of false tax returns under 26 U.S.C. § 7206(2). Iley admitted to improperly using at least $11,000,000 from his payroll clients. Iley received a sentence of 151 months of incarceration, followed by 36 months of supervised release.

In 2014 and 2015, Iley funded an IRA at Jackson National Life Insurance Company ("Jackson National") with $500,000. During these cases, Iley requested withdrawals of approximately $230,000 from the IRA, which Jackson National honored without court approval. Of the $230,000 withdrawn, $184,585.33 was withdrawn after Trustee was appointed without his consent or knowledge and without court approval. Jackson National honored the withdrawals despite having been subpoenaed by the United States in connection with a grand jury investigating Iley's conduct, despite a fraud hold on Iley's account, and despite Jackson National having been served with a subpoena on July 21, 2016 by Trustee. Trustee seeks to recover $184,585.33 from Jackson National for the benefit of creditors.

## JURISDICTION, VENUE, AND *STERN*

1. The underlying bankruptcy cases were commenced on December 28, 2015, when creditors filed involuntary chapter 7 petitions against Don Richard Iley and Iley & Associates, Inc. Prior to ruling on the involuntary petitions, Don Iley and Iley & Associates moved to convert the cases to chapter 11. On January 26, 2016, the Court entered orders converting the cases to chapter 11 and entered orders for relief.

2. On February 2, 2016, the Court entered an order jointly administering the underlying bankruptcy cases of Don Iley and Iley & Associates.

3. On May 11, 2016, the Court entered orders converting the bankruptcy cases to chapter 7. Trustee was appointed trustee in each case.

4. On November 16, 2016, the Court entered an order substantively consolidating the assets and liabilities of the estates of Don Iley and Iley & Associates.

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a).

6. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(F) and (H).

7. Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

8. Trustee consents to entry of final judgment by this Court.

## GENERAL ALLEGATIONS

*Background*

9. Don Iley became a certified public accountant in 1996 and in the same year formed Iley & Associates. Through Iley & Associates, Don Iley provided accounting, tax, bookkeeping, and payroll services. From 1996 through 2015, Don Iley was the sole owner and officer and exercised sole control over the finances of Iley & Associates. Don Iley and Iley & Associates may be collectively referred to as "Iley."

10. The payroll services offered by Iley & Associates involved helping clients calculate, withhold, and pay payroll taxes to the relevant taxing authorities. For each payroll period for his payroll clients, Iley was supposed to calculate the clients' federal, state, and local payroll taxes, including social security and Medicare taxes (collectively, the "Employment Taxes").

11. Iley had access to each of the payroll clients' bank accounts. For each of the clients' payroll periods, Iley would calculate the wages owed to the payroll clients' employees and the Employment Taxes. Iley would then transfer two sums from each payroll client's account into an Iley & Associates account. The first amount would be for the net wages owed to the payroll client's employees. The second amount would be for the Employment Taxes.

12. Iley would then direct deposit the wages owed to payroll client's employees directly into their bank accounts. Iley was then supposed to pay the corresponding clients' Employment Taxes to the relevant taxing authorities, such as the Department of Treasury, Colorado Department of Revenue, and City of Denver. Iley did so for the Employment Taxes owed to the Colorado Department of Revenue and the City of Denver.

13. Iley would calculate and prepare IRS Forms 940 and 941, among others, to report the amount of wages and Employment Taxes paid by the payroll clients. Iley would submit these forms to the payroll clients and represent to each that forms were filed and the federal Employment Taxes were paid.

*The Criminal Scheme*

14. In January 2009, Iley experimented with failing to pay the federal Employment Taxes on behalf of certain payroll clients. By January 2011, Iley expanded his scheme to include every payroll client for whom he provided payroll services. From January 2011 through December 2015, Iley paid all state and local Employment Taxes, but systematically failed to pay the federal Employment taxes. Instead, Iley used that money for personal and business purposes.

15. To conceal the scheme, Iley caused his employees to send to each payroll client a Form 941, which correctly calculated the federal Employment Taxes, along with a cover letter that represented that the Form 941 included with each letter was a file copy of the actual Form 941 filed with the IRS, and that Iley had paid or would pay the taxes. For example, a typical

cover letter read: "Please find enclosed a file copy of your 2nd quarter payroll tax filings for your records. Don Iley pays your taxes, so there is nothing more that you need to do . . . ."

16. Instead of filing the federal Form 941 that Iley sent to each of his payroll clients (which correctly calculated the federal Employment Taxes), Iley created and filed false Form 941 returns with the Internal Revenue Service that showed that each payroll client had no Employment Taxes due and owing and had paid no wages. Iley did this for each payroll client for each quarter from January 2011 through the discovery of his scheme in 2015.

17. In about September 2015, certain clients became aware that Iley had failed to pay their federal Employment Taxes. Those clients then demanded money from Iley. From September 30, 2015 through November 13, 2015, Iley made approximately $1,800,000 in payments to the former payroll clients or their principals who had discovered the scheme. In the same time period, Iley made payments to the Department of Treasury for the benefit of certain of the payroll clients that had discovered the scheme in the aggregate amount of approximately $866,000.

18. The vast majority of Iley's former payroll clients were not so fortunate and did not learn of the scheme until money was gone and these bankruptcy cases were commenced. In fact, despite the discovery of the scheme months before, Iley continued to collect money through November 18, 2015 from payroll clients who remained unaware of the fraudulent scheme.

19. On April 18, 2017, Iley pleaded guilty to wire fraud under 18 U.S.C. § 1343 and aiding in the preparation of false tax returns under 26 U.S.C. § 7206(2). Iley admitted to improperly using at least $11,000,000 from his payroll clients. A copy of Don Iley's plea agreement, which details the scheme, is attached as **Exhibit 1**. Don Iley received a sentence of 151 months of incarceration, followed by 36 months of supervised release.

20. Don Iley and Iley & Associates were insolvent. Within a year of starting the scheme, Don Iley and Iley & Associates owed millions to payroll service clients, and the debts continued to grow as the fraud continued. After the scheme began, the assets of Don Iley and Iley & Associates were always less than the debts resulting from the scheme because Iley spent a portion of the money on his lifestyle and paying for expenses of Iley & Associates.

21. Creditors, including Iley's victims / former payroll clients, filed claims in these cases in an aggregate amount of more than $23,000,000.

*The IRA*

22. In 2014, Iley began implementing asset protection strategies to keep the fruits of his scheme for himself. For example, Iley made more than $900,000 of accelerated payments on his mortgage, which transferred $450,000 in equity in the house to his wife. Iley also began opening retirement accounts that in most circumstances are exempt from creditors under state and federal law.

23. In 2014, Iley opened an IRA at Jackson National. Iley funded the IRA with $500,000 as follows:

    a. $50,000.00 on January 2, 2014 (**Exhibit 2**, at 1 (copies of checks));

    b. $50,000.00 on March 18, 2014 (**Exhibit 2**, at 2 (copies of checks));

    c. $50,000.00 on June 9, 2014 (**Exhibit 2**, at 3 (copies of checks));

    d. $50,000.00 on September 29, 2014 (**Exhibit 2**, at 4 (copies of checks));

    e. $75,000.00 on November 12, 2014 (**Exhibit 2**, at 5 (copies of checks));

    f. $25,000.00 on December 4, 2014 (**Exhibit 2**, at 6 (copies of checks));

    g. $50,000.00 on March 6, 2015 (**Exhibit 2**, at 7 (copies of checks));

    h. $50,000.00 on April 20, 2015 (**Exhibit 2**, at 8 (copies of checks));

    i. $50,000.00 on June 4, 2015 (**Exhibit 2**, at 9 (copies of checks)); and

    j. $50,000.00 on August 21, 2015 (**Exhibit 2**, at 10 (copies of checks)).

24. When these cases were commenced, the IRA had a value of approximately $470,717.74. Iley claimed the IRA as exempt.

*The IRA Withdrawals and History*

25. In January 2016, Iley requested a withdrawal from the IRA of $45,000. At the time of the request, Jackson National had Iley on a fraud alert. Nevertheless, Jackson National honored the request and paid Iley $45,000. A copy of the withdrawal request and the check are attached as **Exhibit 3**. Neither Iley nor Jackson National requested or received bankruptcy court approval for the withdrawal.

26. On March 11, 2016, the Court entered an order extending the deadlines to object to Iley's claimed exemptions until June 10, 2016.

27. On March 14, 2016, the United States Attorney sent a subpoena in connection with a grand jury investigation to Jackson National. On information and belief, Jackson National produced documents concerning the IRA to the government.

28. On May 16, 2016, five days after Trustee was appointed, Iley requested a withdrawal of $100,000 from the IRA. Jackson National honored the request and paid Iley $100,000. A copy of the withdrawal request and the check are attached as **Exhibit 4**. Neither Iley nor Jackson National requested or received bankruptcy court approval for the withdrawal.

29. Don Iley did not voluntarily produce documents or respond to questions after Trustee was appointed. Instead, Iley asserted his Fifth Amendment right to not testify. As a result, Trustee served subpoenas on numerous entities to obtain basic information about Iley's assets and financial transactions. In July and August 2016, Trustee received approximately 50,000 pages of paper and electronic documents in response to subpoenas.

30. On June 8, 2016, the Court entered an order extending the time to object to Iley's exemptions through July 15, 2016.

31. On July 13, 2016, Trustee filed an objection to Iley's exemptions, including the exemption claimed in the IRA.

32. On July 21, 2016, Trustee served a subpoena on Jackson National's registered agent, by which Trustee requested documents related to the IRA. Trustee included with the subpoena a letter identifying Trustee as the representative of the estate and a copy of the order appointing Trustee.

33. Jackson National produced documents in response to the subpoena on or about August 6, 2016.

34. On September 5, 2016, Iley requested a withdrawal of $84,585.33 from the IRA, which Jackson National honored by sending a check to Iley. Neither Iley nor Jackson National requested or received bankruptcy court approval for the withdrawal. Trustee was unaware of the request or the payment until May 2017.

35. Trustee sent a letter to Jackson National on September 29, 2016 requesting that Jackson National turn over the full value of the IRA. Jackson National did not comply with the request.

36. On October 4, 2016, Iley submitted a request to Jackson National to withdraw $60,000 from the IRA. Jackson National refused the request and promptly informed Trustee of the request. Jackson National did not, however, inform Trustee of the September withdrawal.

37. On October 20, 2016, unaware of the September withdrawal, Trustee filed a motion seeking turnover of the IRA. In the motion, Trustee identified the January withdrawal, the May withdrawal, and the October attempted-withdrawal. Jackson National filed an objection to the turnover request and again failed to disclose the September withdrawal.

38. In November 2016, Trustee commenced an adversary proceeding against Jackson National and the trustee of a different IRA to recover the contributions to the IRA, and another retirement account Iley created, as alleged fraudulent transfers. Jackson National answered the complaint and again failed to disclose the September withdrawal.

39. Trustee was unaware of the September withdrawal until May 15, 2017, when Trustee and Don Iley were negotiating a settlement of Trustee's objections to Iley's claimed exemptions, including in the IRA. As part of that process, Trustee investigated the then-current

balance of certain retirement accounts, including the IRA. After Trustee made additional requests for information, Jackson National disclosed the September 2016 withdrawal on May 15, 2017.

## FIRST CLAIM FOR RELIEF
### (Sanctions for Violation of Automatic Stay Pursuant to 11 U.S.C. §§ 105 and 362)

40. Trustee incorporates his previous allegations.

41. The automatic stay of 11 U.S.C. § 362(a) prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).

42. In honoring Iley's May and September 2016 withdrawal requests, Jackson National acted to obtain possession of or exercise control over property of the estate without court approval and without any authorization under the bankruptcy code, 11 U.S.C. §§ 101-1532.

43. Jackson National violated the automatic stay of 11 U.S.C. § 362.

44. This Court is authorized to award sanctions to Trustee under 11 U.S.C. § 105 to compensate for injuries suffered as a result of a creditor's willful violation of the automatic stay. *In re Skinner*, 917 F.2d 444, at 447 (10th Cir. 1990). A willful violation requires only a deliberate or intentional act and knowledge of the bankruptcy case. *In re Diviney*, 225 B.R. 762, 774 (B.A.P. 10th Cir. 1998). A willful violation does not require a specific intent to violate the automatic stay. *Id.*

45. On information and belief, Jackson National had notice or actual knowledge of the bankruptcy at the time of the May withdrawal. Jackson National had actual knowledge of the bankruptcies at the time of the September withdrawal because Jackson National had already produced documents in response to a subpoena from Trustee. As a result, Jackson National's actions were willful in that it had notice or actual knowledge of these bankruptcy cases and it acted intentionally when it honored the May and September 2016 withdrawal requests and paid Iley a total of $184,585.33.

46. Jackson National should be sanctioned for its willful violations of the automatic stay in the amount of $184,585.33.

## SECOND CLAIM FOR RELIEF
### (Turnover Pursuant to 11 U.S.C. § 542)

47. Trustee incorporates his previous allegations.

48. Section 542 provides that

an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this

title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a).

49. The IRA was property of the estate and was not of inconsequential value or benefit to the estate. Specifically, the IRA had a value of more than $400,000 at the time of the May withdrawal and $300,000 at the time of the September withdrawal. While Iley had claimed the IRA as exempt, the deadline to object had not run as of the time of the May withdrawal. Trustee had objected to the claimed exemption in the IRA at the time of the September withdrawal.

50. On information and belief, Jackson National had notice or actual knowledge of the bankruptcy at the time of the May withdrawal. Jackson National had actual knowledge of the bankruptcies at the time of the September withdrawal because Jackson National had already produced documents in response to a subpoena from Trustee. As a result, Jackson National's actions were willful in that it had notice or actual knowledge of these bankruptcy cases and it acted intentionally when it honored the May and September 2016 withdrawal requests and paid Iley $184,585.33.

51. To be subject to turnover under § 542(a), an entity must have possession, custody, or control "during the case." 11 U.S.C. § 542(a). An entity does not need to be in present possession of the property to be subject to the requirement of § 542(a) that the entity turnover the value of the property of the estate. *In re Auld*, 561 B.R. 512, 519 (B.A.P. 10th Cir. 2017). Jackson National had possession, custody, or control over the IRA at the time it honored the May and September 2016 withdrawal requests and paid Iley $185,000. Thus, Jackson National had possession, custody, or control of the IRA during the case.

52. Trustee is entitled to judgment against Jackson National under 11 U.S.C. § 542 for turnover of the $184,585.33 value of the May and September withdrawals.

**WHEREFORE**, Trustee respectfully requests that this Court enter an Order and Judgment in Trustee's favor and against Jackson National:

    a. pursuant to 11 U.S.C. §§ 101 and 362, awarding Trustee sanctions against Jackson National for its willful violation of the automatic stay in the amount of $185,000; and

    b. pursuant to 11 U.S.C. § 542, entering judgment against Jackson National to turn over the value of the May and September 2016 withdrawals in the amount of $184,585.33; and

    c. granting any additional relief the Court deems just and proper.

Dated: November 8, 2017                    Respectfully submitted,

**ONSAGER | FLETCHER | JOHNSON, LLC**

*s/ Andrew D. Johnson*
   Andrew D. Johnson, #36879
   Gabrielle G. Palmer, #48948
1801 Broadway, Suite 900
Denver, Colorado 80202
Ph: (720) 457-7061
ajohnson@OFJlaw.com
gpalmer@OFJlaw.com

*Counsel for Tom H. Connolly as Chapter 7 Trustee*