**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re: | ) |
| | ) Case No. 15-23985-EEB |
| DON RICHARD ILEY, | ) Chapter 7 |
| | ) |
| Debtor. | ) |
| | ) |
| In re: | ) Case No. 15-23986-EEB |
| | ) Chapter 7 |
| ILEY & ASSOCIATES, INC., | ) |
| | ) Jointly Administered Under |
| Debtor. | ) Case No. 15-23985-EEB |
| TOM H. CONNOLLY, | ) |
| Chapter 7 Trustee, | ) |
| | ) Adversary Proceeding No. 17- |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HAWAIIAN JELLYS, LLC, SNAPORTATION, LLC, and PAUL GERSTENBERGER, | ) |
| | ) |
| Defendants. | ) |

**COMPLAINT**

Tom H. Connolly, as chapter 7 trustee ("Trustee"), files this Complaint and states as follows:

**INTRODUCTION**

Don Iley operated a fraudulent payroll scheme through Iley & Associates, Inc. Iley & Associates processed payroll for more than 140 clients and withdrew money from the clients' bank accounts to pay the employees' wages and was supposed to pay the federal, state, and local payroll taxes to the appropriate taxing authority. However, Iley failed to pay the federal payroll taxes on behalf of his clients from 2011 through 2015. Iley concealed his scheme by creating and filing false payroll tax returns for his clients.

Instead of paying his clients' payroll taxes as he promised, Iley used the money for personal and business purposes, including (1) to pay $260,000 for the design, construction, landscaping, and furnishing of his residence, (2) to pay $900,000 in accelerated principal payments on Iley's mortgage; (3) to make more than $1,000,000 in payments in business ventures and retirement accounts; (4) to pay hundreds of thousands of dollars in various business

expenses for Iley & Associates; and (5) to pay for numerous personal expenses, including his children's college tuition.

On April 18, 2017, Iley pleaded guilty to wire fraud under 18 U.S.C. § 1343 and aiding in the preparation of false tax returns under 26 U.S.C. § 7206(2). Iley admitted to improperly using at least $11,000,000 from his payroll clients. Iley received a sentence of 151 months of incarceration, followed by 36 months of supervised release.

Among the business ventures Iley invested in were ventures promoted by Paul Gerstenberger. From February 2013 through May 2016, Iley and Iley & Associates transferred nearly $600,000 to Defendants. Iley and Iley & Associates got nothing in return for the transfers. Trustee seeks to avoid and recover the money as fraudulent transfers.

### JURISDICTION, VENUE, and *STERN*

1. The underlying bankruptcy cases were commenced on December 28, 2015, when creditors filed involuntary chapter 7 petitions against Don Richard Iley and Iley & Associates, Inc. Prior to ruling on the involuntary petitions, Don Iley and Iley & Associates moved to convert the cases to chapter 11. On January 26, 2016, the Court entered orders converting the cases to chapter 11 and entered orders for relief.

2. On February 2, 2016, the Court entered an order jointly administering the underlying bankruptcy cases of Don Iley and Iley & Associates.

3. On May 11, 2016, the Court entered orders converting the bankruptcy cases to chapter 7. Trustee was appointed trustee in each case.

4. On November 16, 2016, the Court entered an order substantively consolidating the assets and liabilities of the estates of Don Iley and Iley & Associates.

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a).

6. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(F) and (H).

7. Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

8. Trustee consents to entry of final judgment by this Court.

### GENERAL ALLEGATIONS

*Iley Background*

9. Don Iley became a certified public accountant in 1996 and in the same year formed Iley & Associates. Through Iley & Associates, Don Iley provided accounting, tax, bookkeeping, and payroll services. From 1996 through 2015, Don Iley was the sole owner and

officer and exercised sole control over the finances of Iley & Associates. Don Iley and Iley & Associates may be collectively referred to as "Iley."

10. The payroll services offered by Iley & Associates involved helping clients calculate, withhold, and pay payroll taxes to the relevant taxing authorities. For each payroll period for his payroll clients, Iley was supposed to calculate the clients' federal, state, and local payroll taxes, including social security and Medicare taxes (collectively, the "Employment Taxes").

11. Iley had access to each of the payroll clients' bank accounts. For each of the clients' payroll periods, Iley would calculate the wages owed to the payroll clients' employees and the Employment Taxes. Iley would then transfer two sums from each payroll client's account into an Iley & Associates account. The first amount would be for the net wages owed to the payroll client's employees. The second amount would be for the Employment Taxes.

12. Iley would then direct deposit the wages owed to payroll client's employees directly into their bank accounts. Iley was then supposed to pay the corresponding clients' Employment Taxes to the relevant taxing authorities, such as the Department of Treasury, Colorado Department of Revenue, and City of Denver. Iley did so for the Employment Taxes owed to the Colorado Department of Revenue and the City of Denver.

13. Iley would calculate and prepare IRS Forms 940 and 941, among others, to report the amount of wages and Employment Taxes paid by the payroll clients. Iley would submit these forms to the payroll clients and represent to each that forms were filed and the federal Employment Taxes were paid.

*The Criminal Scheme*

14. In January 2009, Iley experimented with failing to pay the federal Employment Taxes on behalf of certain payroll clients. By January 2011, Iley expanded his scheme to include every payroll client for whom he provided payroll services. From January 2011 through December 2015, Iley paid all state and local Employment Taxes, but systematically failed to pay the federal Employment Taxes. Instead, Iley used that money for personal and business purposes.

15. To conceal the scheme, Iley caused his employees to send to each payroll client a Form 941, which correctly calculated the federal Employment Taxes, along with a cover letter that represented that the Form 941 included with each letter was a file copy of the actual Form 941 filed with the IRS, and that Iley had paid or would pay the taxes. For example, a typical cover letter read: "Please find enclosed a file copy of your 2nd quarter payroll tax filings for your records. Don Iley pays your taxes, so there is nothing more that you need to do . . . ."

16. Instead of filing the federal Form 941 that Iley sent to each of his payroll clients (which correctly calculated the federal Employment Taxes), Iley created and filed false Form 941 returns with the Internal Revenue Service that showed that each payroll client had no Employment Taxes due and owing and had paid no wages. Iley did this for each payroll client for each quarter from January 2011 through the discovery of his scheme in 2015.

17. In about September 2015, certain clients became aware that Iley had failed to pay their federal Employment Taxes. Those clients then demanded money from Iley. From September 30, 2015 through November 13, 2015, Iley made approximately $1,800,000 in payments to the former payroll clients or their principals who had discovered the scheme. In the same time period, Iley made payments to the Department of Treasury for the benefit of certain of the payroll clients that had discovered the scheme in the aggregate amount of approximately $866,000.

18. The vast majority of Iley's former payroll clients were not so fortunate and did not learn of the scheme until money was gone and these bankruptcy cases were commenced. In fact, despite the discovery of the scheme months before, Iley continued to collect money through November 18, 2015 from payroll clients who remained unaware of the fraudulent scheme.

19. On April 18, 2017, Iley pleaded guilty to wire fraud under 18 U.S.C. § 1343 and aiding in the preparation of false tax returns under 26 U.S.C. § 7206(2). Iley admitted to improperly using at least $11,000,000 from his payroll clients. A copy of Don Iley's plea agreement, which details the scheme, is attached as **Exhibit 1**. Don Iley received a sentence of 151 months of incarceration, followed by 36 months of supervised release.

20. Don Iley and Iley & Associates were insolvent. Within a year of starting the scheme, Don Iley and Iley & Associates owed millions to payroll service clients, and the debts continued to grow as the fraud continued. After the scheme began, the assets of Don Iley and Iley & Associates were always less than the debts resulting from the scheme because Iley spent a portion of the money on his lifestyle and paying for expenses of Iley & Associates.

21. Creditors, including Iley's victims / former payroll clients, filed claims in these cases in an aggregate amount of more than $23,000,000.

*The Gerstenbergers, Hawaiian Jellys, and Snaportation*

22. Paul Gerstenberger and Iley met in approximately 1995. At that time, Paul Gerstenberger was involved in a business that needed a bookkeeper, and Iley began doing bookkeeping for Mr. Gerstenberger's business. From 1995 through 2015, Iley was the accountant and/or bookkeeper for a number Mr. Gerstenberger's businesses.

23. Mr. Gerstenberger began Hawaiian Jellys in 2011. Hawaiian Jellys designed and, to a limited extent, sold footwear, including flip flops until 2015.

24. Iley provided accounting and bookkeeping services to Hawaiian Jellys beginning in 2011. Iley was compensated for providing accounting and bookkeeping services to Hawaiian Jellys with 250,000 membership units in Hawaiian Jellys in 2013.

25. From October 2013 through February 2015, Iley acted as the chief financial officer of Hawaiian Jellys and Iley was an authorized signer on Hawaiian Jellys' bank accounts.

26. Mr. Gerstenberger had grand ambitions for Hawaiian Jellys, which included selling NFL-branded products at Costco. However, Hawaiian Jellys was never financially successful. In fact, Hawaiian Jellys continuously required cash infusions to keep going. Gerstenberger asked Iley for money to keep Hawaiian Jellys afloat. From October 2013 through February 2015, Iley & Associates transferred $177,505.43 to Hawaiian Jellys from US Bank account ending in 4136 (the "Support Payments"). A list of the Support Payments by date, amount, and account is attached as **Exhibit 2**.

27. Hawaiian Jellys gave nothing in return for the Support Payments, and Iley did not even keep an accounting of the transfers as though the Support Payments would be repaid.

28. On information and belief, Iley caused Iley & Associates to make the $177,505.43 worth of transfers to Hawaiian Jellys as informal investments. Iley believed that Hawaiian Jellys would become so financially successful that Iley would receive substantial sums for his work and the Support Payments that would allow Iley to repay the money he bilked from the Iley payroll clients.

29. Paul Gerstenberger treated Hawaiian Jellys' money as his own. From 2013 through 2015, Gerstenberger took out substantial amounts of money from Hawaiian Jellys, had Hawaiian Jellys pay for his Mercedes, for his daughter's private school tuition, and other personal expenses. On information and belief, Gerstenberger also caused Hawaiian Jellys to pay expenses for Gerstenberger's other business ventures, including Snaportation, LLC. In addition, Paul Gerstenberger had a debit card for Hawaiian Jellys' account and used the debit card for personal purposes to pay for his living expenses.

30. Hawaiian Jellys never kept books and records and did not hold meetings of equity interest holders or meetings of any board. Hawaiian Jellys often did not file tax returns.

31. To curry favor with the Gerstenbergers, Iley charged travel and lodging for Paul Gerstenberger in the total amount of $4,639.05 and charged travel and lodging for Paul Gerstenberger's wife, Celerina Gerstenberger, to Iley's credit cards in the total amount of $4,639.05(the "Gerstenberger Gifts"). The list of the Gerstenberger Gifts by date, amount, and method of payment is on **Exhibit 2**.

32. Paul Gerstenberger also owned a majority interest in and controlled Snaportation, LLC, which was developing a smartphone app called "God's Eye." Like Hawaiian Jellys, Gerstenberger had grand ambitions for Snaportation, but to date, it too has been a financial failure.

33. As Iley's scheme was unraveling, Iley became desperate for money to repay his victims. Iley caused Iley & Associates to pay $50,000 to Snaportation (the "Snaportation Payment") for 10% of the equity interests in Snaportation on October 20, 2015. On information and belief, Iley believed Snaportation would be wildly successful. In fact, before Connolly's appointment, Iley filed a motion to sell the estate's interest in Snaportation to Paul Gerstenberger for $12,000,000. Gerstenberger's offer to purchase the estate's interest in Snaportation turned out to be a sham.

34. On October 6, 2015, Hawaiian Jellys loaned Don Iley $450,000 by electronically transferring $450,000 to Iley's personal bank account ending in 2759 at US Bank.

35. Iley repaid the $450,000 by electronic transfer to Hawaiian Jellys' account as follows: $150,000 on October 6, 2015, $100,000 on October 13, 2015, $100,000 on October 15, 2015, and $100,000 on October 26, 2015 (collectively, the "Preference Payments").

36. After this case was filed, Iley used Hawaiian Jellys to launder money. On March 10, 2016, Don Iley electronically transferred $15,651.26 to Hawaiian Jellys. On May 2, 2016, Iley transferred $6,000 to Hawaiian Jellys (collectively the "DIP Payments").

37. A list of the Preference Payments, the DIP Payments, and the Snaportation Payment by amount, account, and date is attached as **Exhibit 2**.

## FIRST CLAIM FOR RELIEF
### (Avoidance and Recovery of Support Payments Pursuant to 11 U.S.C. §§ 544 and 550, and Colo. Rev. Stat. § 38-8-105(1)(a))

38. Trustee incorporates his previous allegations.

39. The Support Payments were transfers of an interest in property of Iley & Associates as the payments came from Iley & Associates bank accounts ending in 4136 at U.S. Bank.

40. The Support Payments were made within four years prior to the petition date.

41. The Support Payments were made with actual intent to hinder, delay, or defraud Iley's victims / payroll services clients.

42. Actual fraudulent intent is shown by, among other things, the following:

   a. In the plea agreement, Iley admitted his intent to defraud the payroll service clients of Iley & Associates. At all times, Iley was the sole owner, officer, and person in control of Iley & Associates and used Iley & Associates to facilitate his scheme;

   b. Before the Support Payments were made, Iley and Iley & Associates had been sued by payroll services clients, had been sanctioned by the Colorado State Board of Accountancy for failing to pay taxes for payroll services clients, and had been threatened with suit by former payroll services clients. Don Iley was engaged in a brazen criminal enterprise to defraud his payroll clients. Don Iley's criminal scheme to defraud his payroll clients and use their money for his personal purposes always carried the certainty of litigation by the payroll clients he was defrauding and criminal prosecution. The question was when, not if. Both eventually occurred, even though Don Iley carefully refined the scheme after his first attempt was discovered and he was sued and professionally reprimanded;

    c. Iley & Associates received no economic value in exchange for the Support Payments;

    d. Iley and Iley & Associates were insolvent. Specifically, Iley and Iley & Associates owed millions to payroll service clients as the result of the fraudulent scheme, and the debts continued to grow as the fraud continued. Moreover, despite the fact that his scheme had been discovered and Iley & Associates paid approximately $2,660,000 to or for the benefit of payroll clients who had discovered the scheme, Iley continued to process payroll for clients who had not yet learned of his scheme through November 18, 2015. Iley admitted to bilking his clients out of approximately $11,000,000; and

    e. Don Iley also concealed assets and failed to disclose material financial transactions, including (i) a $200,000 payment to his wife, Mary Iley, made shortly before the bankruptcy, (ii) his contribution of more than $500,000 to IRAs in the two years prior to the bankruptcy, (iii) his ownership interest in a 401(k) with a value of more than $150,000, (iv) his ownership of four additional life insurance policies with cash surrender value, and (v) his withdrawal of money from the IRAs and the undisclosed 401(k) *after* the bankruptcy was commenced.

  43. In January 2009, Iley stopped paying the federal withholding taxes on behalf of certain payroll clients. By January 2011, Iley expanded his scheme to include every payroll client for whom he provided payroll services. By the time of the first of the Support Payments, Iley had bilked payroll clients out of more than $1,000,000.

  44. The Support Payments are avoidable under Colo. Rev. Stat. § 38-8-105(1)(a) and 11 U.S.C. § 544.

  45. Trustee is entitled to judgment in the amount of the Support Payments against Hawaiian Jellys under 11 U.S.C. § 550(a)(1).

## SECOND CLAIM FOR RELIEF
### (Avoidance of the Support Payments
### Pursuant to 11 U.S.C. §§ 544 and 550 and Colo. Rev. Stat. § 38-8-105(1)(b))

  46. Trustee incorporates his previous allegations.

  47. The Support Payments were transfers of an interest in property of Iley & Associates as the payments came from an Iley & Associates bank account ending in 4136 at U.S. Bank.

  48. The Support Payments were made within four years prior to the petition date.

  49. Iley & Associates did not receive reasonably equivalent value for the Support Payments. In fact, Iley & Associates received nothing in exchange for the Support Payments.

50. At the time of each of the Support Payments, Iley & Associates was insolvent and/or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due. In fact, with each dollar Iley bilked from his payroll clients in the criminal scheme, Iley had debts he was not paying and could not pay. Specifically, Iley and Iley & Associates owed millions to payroll service clients as the result of the fraudulent scheme, and the debts continued to grow as the fraud continued. Moreover, despite the fact that his scheme had been discovered and Iley & Associates paid approximately $2,660,000 to or for the benefit of payroll clients who had discovered the scheme, Iley continued to process payroll for clients who had not yet learned of his scheme through November 18, 2015. Iley admitted to bilking his clients out of approximately $11,000,000.

51. In January 2009, Iley stopped paying the federal withholding taxes on behalf of certain payroll clients. By January 2011, Iley expanded his scheme to include every payroll client for whom he provided payroll services. By the time of the first of the Support Payments, Iley had bilked payroll clients out of more than $1,000,000.

52. The Support Payments are avoidable under Colo. Rev. Stat. § 38-8-105(1)(b) and 11 U.S.C. § 544.

53. Trustee is entitled to judgment in the amount of the Support Payments against Hawaiian Jellys under 11 U.S.C. § 550(a)(1).

### THIRD CLAIM FOR RELIEF
### (Avoidance of the Two-Year Transfers
### Pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550(a)(1))

54. Trustee incorporates his previous allegations.

55. Certain of the Support Payments were made within two years prior to the petition date (the "Two-Year Transfers") in the amount of $92,905.43.

56. The Two-Year Transfers were transfers of an interest in property of Iley & Associates as the payments came from an Iley & Associates bank account ending in 4136 at U.S. Bank.

57. The Two-Year Transfers were made with actual intent to hinder, delay, or defraud Iley's victims / payroll services clients.

58. Actual fraudulent intent is shown by, among other things, the following:

    a. In the plea agreement, Iley admitted his intent to defraud the payroll service clients of Iley & Associates. At all times, Iley was the sole owner, officer, and person in control of Iley & Associates and used Iley & Associates to facilitate his scheme;

    b. Before the Two-Year Payments were made, Iley and Iley & Associates had been sued by payroll services clients, had been sanctioned by the Colorado State Board of

Accountancy for failing to pay taxes for payroll services clients, and had been threatened with suit by former payroll services clients. Don Iley was engaged in a brazen criminal enterprise to defraud his payroll clients. Don Iley's criminal scheme to defraud his payroll clients and use their money for his personal purposes always carried the certainty of litigation by the payroll clients he was defrauding and criminal prosecution. The question was when, not if. Both eventually occurred, even though Don Iley carefully refined the scheme after his first attempt was discovered and he was sued and professionally reprimanded;

        c.      Iley & Associates received no economic value in exchange for the Support Payments. In fact, Iley & Associates received nothing at all;

        d.      Iley and Iley & Associates were insolvent. Specifically, Iley and Iley & Associates owed millions to payroll service clients as the result of the fraudulent scheme, and the debts continued to grow as the fraud continued. Moreover, despite the fact that his scheme had been discovered and Iley & Associates paid approximately $2,660,000 to or for the benefit of payroll clients who had discovered the scheme, Iley continued to process payroll for clients who had not yet learned of his scheme through November 18, 2015. Iley admitted to bilking his clients out of approximately $11,000,000; and

        e.      Don Iley also concealed assets and failed to disclose material financial transactions, including (i) a $200,000 payment to his wife, Mary Iley, made shortly before the bankruptcy, (ii) his contribution of more than $500,000 to IRAs in the two years prior to the bankruptcy, (iii) his ownership interest in a 401(k) with a value of more than $150,000, (iv) his ownership of four additional life insurance policies with cash surrender value, and (v) his withdrawal of money from the IRAs and the undisclosed 401(k) *after* the bankruptcy was commenced.

59.      The Two-Year Transfers are avoidable under 11 U.S.C. § 548(a)(1)(A).

60.      Trustee is entitled to judgment in the amount of the Two-Year Transfers against Hawaiian Jellys under 11 U.S.C. § 550(a)(1).

### FOURTH CLAIM FOR RELIEF
### (Avoidance of the Two-Year Transfers
### Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550(a)(1))

61.      Trustee incorporates his previous allegations.

62.      The Two-Year Transfers were transfers of an interest in property of Iley & Associates as the payments came from an Iley & Associates bank account ending in 4136 at U.S. Bank.

63.      The Two-Year Transfers were made within two years prior to the petition date.

64.      Iley & Associates did not receive reasonably equivalent value for the Two-Year Transfers. In fact, Iley & Associates received nothing in exchange for the Two-Year Transfers.

65. At the time of each of the Two-Year Payments, Iley & Associates was insolvent and/or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due. In fact, with each dollar Iley bilked from his payroll clients in the criminal scheme, Iley had debts he was not paying and could not pay. Specifically, Iley and Iley & Associates owed millions to payroll service clients as the result of the fraudulent scheme, and the debts continued to grow as the fraud continued. Moreover, despite the fact that his scheme had been discovered and Iley & Associates paid approximately $2,660,000 to or for the benefit of payroll clients who had discovered the scheme, Iley continued to process payroll for clients who had not yet learned of his scheme through November 18, 2015. Iley admitted to bilking his clients out of approximately $11,000,000.

66. The Two-Year Transfers are avoidable under 11 U.S.C. § 548(a)(1)(B).

67. Trustee is entitled to judgment in the amount of the Two-Year Transfers against Hawaiian Jellys under 11 U.S.C. § 550(a)(1).

## FIFTH CLAIM FOR RELIEF
### (Avoidance of the Preference Payments Pursuant to 11 U.S.C. §§ 547 and 550(a)(1))

68. Trustee incorporates his previous allegations.

69. The Preference Payments were transfers of an interest in property of Don Iley as the payments came from Don Iley's bank account ending in 2759 at U.S. Bank.

70. At the time of the Preference Payments, Don Iley owed debts to Hawaiian Jellys in the amount of Preference Payments.

71. The Preference Payments were for or on account of an antecedent debt owed by Don Iley.

72. The Preference Payments were made within 90 days prior to the petition date.

73. At the time of the Preference Payments, Don Iley and Iley & Associates were hopelessly insolvent. They each owed millions of dollars as the result of the scheme and had substantially less in assets.

74. The Preference Payments enabled Hawaiian Jellys to receive more than it would receive if:

   a. The cases were cases under chapter 7;

   b. The Preference Payments had not been made; and

  c. Hawaiian Jellys received payment in accordance with the provisions of title 11.

75. The Preference Payments are avoidable under 11 U.S.C. § 547(b).

76. Trustee is entitled to judgment in the amount of the Preference Payments against Hawaiian Jellys under 11 U.S.C. § 550(a)(1).

**SIXTH CLAIM FOR RELIEF**
**(Avoidance of the DIP Payments**
**Pursuant to 11 U.S.C. §§ 549 and 550))**

77. Trustee incorporates his previous allegations.

78. The DIP Payments were transfers of an interest in property of the estate as the payments came from Don Iley's debtor-in-possession account.

79. The DIP Payments occurred after the commencement of the underlying bankruptcy cases.

80. The DIP Payments were not authorized under the Bankruptcy Code (11 U.S.C. §§ 101 – 1532) or by the Court.

81. The DIP Payments are avoidable under 11 U.S.C. § 549.

82. Trustee is authorized to judgment in the amount of the DIP Payments against Hawaiian Jellys under 11 U.S.C. § 550(a)(1).

**SEVENTH CLAIM FOR RELIEF**
**(Avoidance of the Snaportation Payment**
**Pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550))**

83. Trustee incorporates his previous allegations.

84. The Snaportation Payment was made within two years prior to the petition date.

85. The Snaportation Payment was a transfer of an interest in property of Iley & Associates as the payment came from Iley & Associates bank account ending in 4136 at U.S. Bank.

86. The Snaportation Payment was made with actual intent to hinder, delay, or defraud Iley's victims / payroll services clients.

87. Actual fraudulent intent is shown by, among other things, the following:

    a.  In the plea agreement, Iley admitted his intent to defraud the payroll service clients of Iley & Associates. At all times, Iley was the sole owner, officer, and person in control of Iley & Associates and used Iley & Associates to facilitate his scheme;

    b.  Before the Snaportation Payment was made, Iley and Iley & Associates had been sued by payroll services clients, had been sanctioned by the Colorado State Board of Accountancy for failing to pay taxes for payroll services clients, and had been threatened with suit by former payroll services clients. Don Iley was engaged in a brazen criminal enterprise to defraud his payroll clients. Don Iley's criminal scheme to defraud his payroll clients and use their money for his personal purposes always carried the certainty of litigation by the payroll clients he was defrauding and criminal prosecution. The question was when, not if. Both eventually occurred, even though Don Iley carefully refined the scheme after his first attempt was discovered and he was sued and professionally reprimanded.

    c.  Iley & Associates received less than reasonably equivalent value for the Snaportation Payment because a 10% interest in Snaportation was worthless;

    d.  Iley and Iley & Associates were hopelessly insolvent. Specifically, Iley and Iley & Associates owed millions to payroll service clients as the result of the fraudulent scheme, and the debts continued to grow as the fraud continued. Moreover, despite the fact that his scheme had been discovered and Iley & Associates paid approximately $2,660,000 to or for the benefit of payroll clients who had discovered the scheme, Iley continued to process payroll for clients who had not yet learned of his scheme through November 18, 2015. Iley admitted to bilking his clients out of approximately $11,000,000; and

    e.  Don Iley also concealed assets and failed to disclose material financial transactions, including (i) a $200,000 payment to his wife, Mary Iley, made shortly before the bankruptcy, (ii) his contribution of more than $500,000 to IRAs in the two years prior to the bankruptcy, (iii) his ownership interest in a 401(k) with a value of more than $150,000, (iv) his ownership of four additional life insurance policies with cash surrender value, and (v) his withdrawal of money from the IRAs and the undisclosed 401(k) *after* the bankruptcy was commenced.

  88.  The Snaportation Payment is avoidable under 11 U.S.C. § 548(a)(1)(A).

  89.  Trustee is entitled to judgment in the amount of the Snaportation Payment against Snaportation under 11 U.S.C. § 550(a)(1).

**EIGHTH CLAIM FOR RELIEF**
**(Avoidance of the Snaportation Payment**
**Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550(a)(1))**

  90.  Trustee incorporates his previous allegations.

91. The Snaportation Payment was a transfer of an interest in property of Iley & Associates as the payment came from Iley & Associates bank account ending in 4136 at U.S. Bank.

92. The Snaportation Payment was made within two years prior to the petition date.

93. Iley & Associates did not receive reasonably equivalent value for the Snaportation Payment. The 10% interest in Snaportation was worthless.

94. At the time of the Snaportation Payment, Iley & Associates was hopelessly insolvent and/or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due. In fact, with each dollar Iley bilked from his payroll clients in the criminal scheme, Iley had debts he was not paying and could not pay. Specifically, Iley and Iley & Associates owed millions to payroll service clients as the result of the fraudulent scheme, and the debts continued to grow as the fraud continued. Moreover, despite the fact that his scheme had been discovered and Iley & Associates paid approximately $2,660,000 to or for the benefit of payroll clients who had discovered the scheme, Iley continued to process payroll for clients who had not yet learned of his scheme through November 18, 2015. Iley admitted to bilking his clients out of approximately $11,000,000.00.

95. The Snaportation Payment is avoidable under 11 U.S.C. § 548(a)(1)(B).

96. Trustee is entitled to judgment in the amount of the Snaportation Payment against Snaportation under 11 U.S.C. § 550(a)(1).

### NINTH CLAIM FOR RELIEF
### (Avoidance of the Gerstenberger Gifts
### Pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550))

97. Trustee incorporates his previous allegations.

98. The Gerstenberger Gifts were made within two years prior to the petition date.

99. The Gerstenberger Gifts were transfers of an interest in property of Don Iley or Iley & Associates as the payment for the Gerstenberger Gifts was on a credit card in the name of Don Iley, which credit cards were paid by Iley & Associates from an Iley & Associates account at US Bank ending in 4136.

100. The Gerstenberger Gifts were made with actual intent to hinder, delay, or defraud Iley's victims / payroll services clients.

101. Actual fraudulent intent is shown by, among other things, the following:

    a. In the plea agreement, Iley admitted his intent to defraud the payroll service clients of Iley & Associates. At all times, Iley was the sole owner, officer, and person in control of Iley & Associates and used Iley & Associates to facilitate his scheme;

   b. Before the Gerstenberger Gifts were made, Iley and Iley & Associates had been sued by payroll services clients, had been sanctioned by the Colorado State Board of Accountancy for failing to pay taxes for payroll services clients, and had been threatened with suit by former payroll services clients. Don Iley was engaged in a brazen criminal enterprise to defraud his payroll clients. Don Iley's criminal scheme to defraud his payroll clients and use their money for his personal purposes always carried the certainty of litigation by the payroll clients he was defrauding and criminal prosecution. The question was when, not if. Both eventually occurred, even though Don Iley carefully refined the scheme after his first attempt was discovered and he was sued and professionally reprimanded.

   c. Iley & Associates received nothing in exchange for the Gerstenberger Gifts;

   d. Iley and Iley & Associates were insolvent. Specifically, Iley and Iley & Associates owed millions to payroll service clients as the result of the fraudulent scheme, and the debts continued to grow as the fraud continued. Moreover, despite the fact that his scheme had been discovered and Iley & Associates paid approximately $2,660,000 to or for the benefit of payroll clients who had discovered the scheme, Iley continued to process payroll for clients who had not yet learned of his scheme through November 18, 2015. Iley admitted to bilking his clients out of approximately $11,000,000; and

   e. Don Iley also concealed assets and failed to disclose material financial transactions, including (i) a $200,000 payment to his wife, Mary Iley, made shortly before the bankruptcy, (ii) his contribution of more than $500,000 to IRAs in the two years prior to the bankruptcy, (iii) his ownership interest in a 401(k) with a value of more than $150,000, (iv) his ownership of four additional life insurance policies with cash surrender value, and (v) his withdrawal of money from the IRAs and the undisclosed 401(k) *after* the bankruptcy was commenced.

 102. The Gerstenberger Gifts are avoidable under 11 U.S.C. § 548(a)(1)(A).

 103. Trustee is entitled to judgment in the amount of the Gerstenberger Gifts against Paul Gerstenberger under 11 U.S.C. § 550(a)(1).

## TENTH CLAIM FOR RELIEF
### (Avoidance of the Gerstenberger Gifts
### Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550(a)(1))

 104. Trustee incorporates his previous allegations.

 105. The Gerstenberger Gifts were made within two years prior to the petition date.

 106. The Gerstenberger Gifts were transfers of an interest in property of Don Iley or Iley & Associates as the payment for Gerstenberger Gifts was on a credit card in the name of

Don Iley, which credit cards were paid by Iley & Associates from Iley & Associates account at US Bank ending in 4136.

107. Iley received nothing of economic value for the Gerstenberger Gifts.

108. At the time of each of the Gerstenberger Gifts, Iley & Associates was insolvent and/or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due. In fact, with each dollar Iley bilked from his payroll clients in the criminal scheme, Iley had debts he was not paying and could not pay. Specifically, Iley and Iley & Associates owed millions to payroll service clients as the result of the fraudulent scheme, and the debts continued to grow as the fraud continued. Moreover, despite the fact that his scheme had been discovered and Iley & Associates paid approximately $2,660,000 to or for the benefit of payroll clients who had discovered the scheme, Iley continued to process payroll for clients who had not yet learned of his scheme through November 18, 2015. Iley admitted to bilking his clients out of approximately $11,000,000.00

109. The Gerstenberger Gifts are avoidable under 11 U.S.C. § 548(a)(1)(B).

110. Trustee is entitled to judgment in the amount of the Gerstenberger Gifts against Paul Gerstenberger under 11 U.S.C. § 550(a)(1).

**ELEVENTH CLAIM FOR RELIEF**
**(Alter Ego Liability))**

111. Trustee incorporates his previous allegations.

112. Paul Gerstenberger exercised dominion and control over Hawaiian Jellys such that its independent identity is non-existent and Hawaiian Jellys is merely an alter ego of Paul Gerstenberger.

113. Gerstenberger used the money of Hawaiian Jellys as his own. Paul Gerstenberger had Hawaiian Jellys pay for his Mercedes, for his daughter's private school tuition, and other personal expenses. On information and belief, Gerstenberger also caused Hawaiian Jellys to pay expenses for Gerstenberger's other business ventures, including Snaportation. In addition, Paul Gerstenberger had a debit card for Hawaiian Jellys' account and used the debit card for his personal purposes to pay for all of his living expenses.

114. Hawaiian Jellys did not maintain corporate books and records.

115. In equity, Paul Gerstenberger should be liable for the Support Payments, the Preference Payments, the DIP Payments, and the Snaportation Payment.

**WHEREFORE**, Trustee respectfully requests that this Court enter judgment in his favor as follows:

  a. pursuant to 11 U.S.C. § 544 and Colo. Rev. Stat. §§ 38-8-105(1)(a) and (b), avoiding the Support Payments and entering judgment against Hawaiian Jellys under 11 U.S.C. § 550 in the amount of $177,505.43;

  b. pursuant to 11 U.S.C. § 548(a)(1)(A) and (B), avoiding the Two-Year Payments and entering judgment against Hawaiian Jellys under 11 U.S.C. § 550 in the amount of $92,905.43;

  c. pursuant to 11 U.S.C. § 547, avoiding the Preference Payments and entering judgment against from Hawaiian Jellys under 11 U.S.C. § 550(a)(1) in the amount of $450,000;

  d. pursuant to 11 U.S.C. § 549, avoiding the DIP Payments and entering judgment against from Hawaiian Jellys under 11 U.S.C. § 550(a)(1) in the amount of $21,651.26;

  e. pursuant to 11 U.S.C. §§ 548(a)(1)(A) and (B), avoiding the Snaportation Payment and entering judgment against Snaportation under 11 U.S.C. § 550(a)(1) in the amount of $50,000;

  f. pursuant to 11 U.S.C. §§ 548(a)(1)(A) and (B), avoiding the Gerstenberger Gifts and entering judgment against Paul Gerstenberger in the amount of $4,639.05;

  g. determining that Paul Gerstenberger is the alter ego of Hawaiian Jellys and liable for the Support Payments, Preference Payments, DIP Payments, and Snaportation Payment; and

  h. granting any additional relief the Court deems just and proper.

Dated: December 14, 2017    Respectfully submitted,

            **ONSAGER | FLETCHER | JOHNSON**

            s/ Andrew D. Johnson
            Andrew D. Johnson, #36879
            Gabrielle G. Palmer, #48948
            1801 Broadway, Suite 900
            Denver, Colorado 80202
            Ph: (720) 457-7061
            ajohnson@OFJlaw.com
            gpalmer@OFJlaw.com

            *Counsel for Tom H. Connolly as Chapter 7 Trustee*